UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

KEVIN VIGIL,

      Petitioner,

                                                CV No. 23-121 MV/GJF
vs.                                                 CR No. 18-739 MV

UNITED STATES OF AMERICA,

      Respondent.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

THIS MATTER is before the Court on Petitioner Kevin Vigil's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("Motion"). CV ECF 1.[1] The United States responded [CV ECF 7] ("Response"), and Vigil did not reply. Having reviewed the briefing and the record, and otherwise being fully advised, the Court **RECOMMENDS** that the Motion be **DENIED** and a certificate of appealability be **DENIED** for the reasons that follow.[2]

**I.    BACKGROUND**

The Tenth Circuit has previously summarized the background of this case on direct appeal:

> According to trial testimony, one weekend in early February 2018, Vigil invited longtime friends Consuelo War and Tommy War over to hang out and drink at his trailer home. Vigil and Consuelo had briefly developed an intimate

---

[1] All citations with CV refer to the civil case 23-cv-121-MV-GJF, and all citations with CR refer to the criminal case 18-cr-739 MV.

[2] Before issuing this PFRD, the Court considered whether an evidentiary hearing was necessary, as instructed by Rule 8(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts. Because the outcome of this Motion turns on matters of law and its recommended disposition requires no further factual development, the Court concluded that no evidentiary hearing was necessary. Because the Court will not conduct a hearing, it also denies Vigil's Motion to Appoint Counsel [CV ECF 10]. *See* Rule 8(c) of the Rules Governing Section 2255 Proceedings for the United States District Courts. The Court also grants *nunc pro tunc* Vigil's Motion for Extension of time to file a Reply [CV ECF 9]. However, the requested extension date of May 30, 2023, has long passed, no reply was filed, and the Court will not extend the reply deadline further.

relationship after she and Tommy divorced in 2004, and the Wars' children—including their six-year-old daughter A.W.—called Vigil "Uncle Kevin." R. vol. 3, 401. On Saturday morning, after drinking together in the morning and early afternoon, the trio left to pick up A.W. from her sister's house.

Once they returned to Vigil's home, the three adults continued drinking until around 9:30 p.m., when Vigil went to sleep in his bedroom. Consuelo testified that half an hour later, A.W. got tired and joined Vigil. Consuelo said she twice checked on A.W. over the next hour, noticing nothing unusual either time. At 1:15 a.m., A.W. woke up and came back out to the kitchen, followed by Vigil ten minutes later. She returned to Vigil's bedroom around 2 a.m., and Vigil did the same five or ten minutes later. Then at about 2:10 a.m., Consuelo also got into Vigil's bed, on the other side of A.W., so that A.W. lay between the two adults.

Consuelo testified that three minutes later, she heard A.W. move and suddenly "gasp like something painful" had happened. *Id.* at 406. Reaching over with her hand, Consuelo felt that A.W.'s pants and underwear were off. Reaching further, Consuelo "felt [Vigil's] underwear off and his erect penis." *Id.* Consuelo turned on the lights and "threw off the blankets" as Vigil stood up and "pull[ed] up his underwear." *Id.* After grabbing A.W., Consuelo left Vigil's home with Tommy and headed to the hospital.

According to Vigil, as A.W. left, she hugged him and said, "Bye, Uncle Kevin." *Id.* at 939. Consuelo denied seeing A.W. hug Kevin and said that when A.W. got in the car, she was "scared, shocked, crying, and in pain." *Id.* at 407. Consuelo also said that during the drive to the hospital, A.W. made statements about the incident that had just occurred, saying, "Mamma, my cookie hurts and my butt hurts. Uncle Kevin put his fingers in my cookie and his pee-pee in my butt twice. And I told him to stop and he wouldn't." *Id.*

Based on this incident, a grand jury indicted Vigil on two counts of aggravated sexual abuse of a child under 18 U.S.C. § 1152 and § 2241(c). Count 1 alleged that Vigil engaged and attempted to engage in contact between his penis and A.W.'s anus. *See* 18 U.S.C. § 2246(2)(A). Count 2 alleged that Vigil penetrated and attempted to penetrate A.W.'s genital opening with his fingers. *See* § 2246(2)(C). . . . The jury ultimately found Vigil not guilty on Count 1 and guilty on Count 2. The district court sentenced Vigil to 360 months in prison, followed by five years of supervised release.

*United States v. Vigil*, No. 20-2160, 2021 WL 4888616, at *1–2 (10th Cir. Oct. 20, 2021). On appeal, Vigil challenged two pretrial rulings: first, whether federal criminal jurisdiction exists and second, whether the judge erred by admitting certain hearsay statements the child made to her mother. The Tenth Circuit affirmed both rulings, and the Supreme Court denied review. *Id. cert. denied,* 212 L. Ed. 2d 48, 142 S. Ct. 1182 (2022). Vigil thereafter filed the instant Motion in which he has raised four grounds of ineffective assistance of counsel. CV ECF 1 ("Pet.").

## II. LEGAL STANDARDS

### A. 28 U.S.C. § 2255

Under 28 U.S.C. § 2255, a federal prisoner "may move the court which imposed [his] sentence to vacate, set aside or correct [his] sentence," when, *inter alia*, "the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). To state a cognizable claim for relief under § 2255, a petitioner must allege that the "error constituted a fundamental defect which inherently result[ed] in a complete miscarriage of justice." *United States v. Addonizio, 442 U.S. 178, 185 (1979), superseded by statute on other grounds as stated in U.S. v. Akinsade,* 686 F.3d 248 (4th Cir. 2012) (internal quotation marks and citation omitted). A court must presume "that the proceedings leading to the conviction were correct." *Klein v. United States*, 880 F.2d 250, 253 (10th Cir. 1989) (citing *United States v. Morgan*, 346 U.S. 502, 512 (1954)). Because Vigil is *pro se*, the Court liberally construes his filings. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Andrews v. Heaton*, 483 F.3d 1070, 1076 (10th Cir. 2007); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

### B. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees a defendant the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *see also Williams v. Taylor*, 529 U.S. 362, 390 (2000) ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'"). To succeed under *Strickland*, a petitioner must show both that his "counsel's representation fell below an objective standard of reasonableness" and "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687–88. Courts "may address the performance and prejudice components in any order, but need not address both if [the petitioner] fails to make

3

a sufficient showing of one." *Cooks v. Ward*, 165 F.3d 1283, 1292–93 (10th Cir. 1998) (citation omitted).

To establish the first prong, a petitioner must overcome the presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 690). This requires the petitioner to establish that the "attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690).

To satisfy the second prong, "[t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In the context of a jury verdict, the prejudice that a habeas petitioner must establish is that—but for counsel's unreasonable conduct—there is a reasonable possibility that the jury would have had reasonable doubt as to the conviction. *See Weaver v. Massachusetts*, 582 U.S. 286, 303 (2017) ("[H]e has not shown prejudice in the ordinary sense, *i.e.*, a reasonable probability that the jury would not have convicted him . . . .").

### III.   PETITIONER'S CLAIMS

Vigil raises four grounds for ineffective assistance of counsel. Vigil first claims that his "public defender did not do his job right" because he failed to "call character witnesses on [his] behalf[.]" Pet. at 4. Ground Two alleges that defense counsel failed to adequately attack the prosecution's DNA evidence. *Id*. at 5. Ground Three maintains that defense counsel failed to argue that the victim's mom was not in Vigil's bed to witness the sexual abuse. *Id*. at 6. Finally,

4

Ground Four asserts that defense counsel was ineffective by not arguing that the victim's mother coached the child to make up the assault. *Id*. at 7.

## IV. ANALYSIS

### A. Ground 1 - Character Witnesses

Vigil first claims that his counsel was ineffective for failing to call character witnesses during trial. Pet. at 4. The government responds that ineffective assistance claims related to a failure to call a witness almost always fail and this claim should as well because Vigil does not explain who would testify, what they would say, and how opening the door to rebuttal character evidence would not have been detrimental. CV ECF 7 at 6-7. The Court agrees with the government.

To succeed on this ground, Vigil must demonstrate both prongs of the *Strickland* test: first, that failing to call a character witness amounted to "incompetence under 'prevailing professional norms,'" and second, "a reasonable probability that the jury would not have convicted him" if his attorney had called character witnesses. *Harrington,* 562 U.S. at 105; *Weaver*, 582 U.S. at 303.

Vigil's vague assertions fail both prongs for three primary reasons. First, he does not identify which witnesses defense counsel should have called or whether they would have been willing to testify on Vigil's behalf. Without this information, Vigil cannot demonstrate either prong. *Snow v. Sirmons*, 474 F.3d 693, 730 n.42 (10th Cir. 2007) ("habeas petitioner must show both that the uncalled witness's testimony would have been favorable and that the witness would have testified at trial"). Second, he does not provide any evidence regarding what these witnesses would have testified to, how they would have supported their character descriptions, and how those descriptions would have called into question his guilt given the amount of direct and circumstantial evidence against him. *See id.* Finally, Vigil fails to even discuss how this testimony

would not have put him at risk of rebuttal or impeachment character evidence—one of the main strategic concerns involved with introducing such testimony in a criminal case.

Proving ineffective assistance for failing to call a witness is notoriously difficult because picking witnesses is such a strategic decision. *See Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008) ("the decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney"). This case is a classic example of Vigil "offer[ing] nothing more than bald, vague assertions—without proper evidentiary support through affidavits or otherwise—regarding the substance and trial impact of prospective witnesses' testimony." *United States v. Lemon*, No. 20-6119, 2021 WL 5858405, at *4 (10th Cir. Dec. 10, 2021). "[U]nder *Strickland*, that is not good enough." *Id.* (citations omitted) (denying habeas relief). The Court finds and concludes that Vigil is not entitled to relief on this ground.

### B. Ground 2 – DNA Evidence

Vigil contends that his counsel failed to adequately assert that his DNA rubbed off on the victim due to secondary transfer from any of the following possible sources: his bathtub or towel, which the victim used while bathing at his house, and/or his bed, in which the victim slept. Pet. at 5. The government responds that defense counsel did argue secondary transfer, and the DNA evidence was overwhelming against secondary transfer in light of the amount of DNA found on the various swabs taken from the victim. CV ECF 7 at 8-10.

Vigil's claim fails to establish the first *Strickland* prong of incompetence under prevailing professional norms because defense counsel did argue secondary transfer during the cross-examination of the DNA expert and had previously introduced evidence that the victim had bathed at Vigil's house. CR ECF 245 at 109 ("Q. Okay. I want to talk to you a little bit about contamination. A. Yes, sir. Q. Now, DNA is a highly sensitive piece of biological material, fair to say? It's transferred easily? A. Sure. Yes, sir."); *id*. at 22 ("Q. . . . Ms. War gave A.W. a bath,

correct? . . . [sustained objection] . . . Did you take any toweling or bathing fabric from Mr. Vigil's home? A. No, I did not.").

Additionally, defense counsel's choice not to pursue the secondary transfer questioning further was a wise strategic decision on counsel's part because it prevented the expert from specifically explaining why the results were unlikely to be explained by secondary transfer from the bath, towel, or bed. Defense council's decision regarding this issue cannot be described as so incompetent that it falls outside of prevailing professional norms. In contrast, upon examination of the full trial transcript, the Court considers defense counsel's strategy for combating the DNA evidence to have been highly prudent.

This argument also fails to establish prejudice for two reasons. First, the expert opined that the results were not indicative of secondary transfer. *Id.* at 123-24 ("Q. Do you think secondary transfer is a likely explanation for the results you see in this case? . . . A. In my opinion . . . . I don't think it was probable in this case [because of] how much DNA, male DNA, was present and how many various types of swabs and locations it was detected on."). The DNA expert previously described that the swabs that had high quantities of male DNA matching Vigil's came from the victim's "vaginal swabs," "anal swabs," "mons pubis [and] outer labia majora swabs[,]" and testing of the underwear she was wearing that night. *Id*. at 118-119. The argument that Vigil insists his counsel should have made would have done little to undercut the expert's testimony.

This argument also fails to establish prejudice because the DNA evidence was only part of the mountain of direct and circumstantial evidence against Vigil. The government relied on many other sources of evidence to prove Vigil's guilt, including the mother's testimony of waking up to find her daughter and Vigil lying next to each other with Vigil's genitals exposed and

hearing her daughter's excited utterances that her vagina and butt hurt. Vigil's DNA arguments do not create a reasonable probability the jury would not have convicted him.

### C. Ground 3 – Failure to Impeach Mother's Testimony About Being in Bed

Vigil next contends that defense counsel failed to impeach the mother's testimony that "she was on the bed." Pet. at 6. Vigil asserts that his lawyer should have told the jury that the mother's testimony cannot be true because "the girl would have been screaming in pain and [the mother] would have heard it and so would [Vigil's] daughter in the other room and [the victim] would have been crying when they were leaving and her mom would have been yelling at [Vigil] or saying something to [him]." *Id*. The government responds that this argument is far too speculative and contradicted by Vigil's own testimony at trial. CV ECF 7 at 10-11. The Court agrees with the government.

The most glaring issue with this claim is Vigil's own trial testimony. He testified along with the victim's mother that the mother was in bed with him and the victim. CR ECF 246 at 198-99 (Vigil testifying that the mother was rubbing his penis trying to have sex with him while the victim was lying in bed with them, and when he rejected the mother, she got upset, grabbed her daughter, and left his residence). Given Vigil's own testimony, it was well within the realm of a strategic decision for defense counsel to forego arguing that the mother was not in the bed or attempting to impeach the mother's testimony that she was in the bed. To do so would have necessarily impeached Vigil's own testimony. Portraying his client as an unreliable witness—worse yet, a liar—would have invited much more skepticism on habeas review than the reasonable approach that defense counsel pursued.

Vigil also argues that defense counsel should have asserted that – if the mother's testimony was truthful – then the victim would have screamed in pain, instead of gasping in discomfort, when he penetrated her. But this claim fails both prongs of the *Strickland* test for the

8

same reasons—it was a strategic choice not to raise this disquieting and crude argument and the chances of this argument leading to a different outcome are far too speculative to justify habeas relief.

The trial transcript reflects that defense counsel adequately elicited Vigil's version of events from him on direct examination, a story that contradicted the victim's mother's testimony in important respects. Defense counsel also peppered the mother with questions supporting Vigil's trial defense, *i.e.*, that she tried to have sex with him. *See* CR Doc. 244 at 56. In so doing, defense counsel made sure the jury had as much information as possible to evaluate the testimony of the two witnesses and decide whose it found more credible.  That is the best that counsel could have done.  And with respect to the prejudice prong, the Court is convinced that there was no reasonable likelihood of acquittal on Count 2 if defense counsel had made the argument that Vigil now insists he should have.  Consequently, Vigil has failed to meet either prong of the *Strickland* test with respect to this ground for relief.

### D.  Ground 4 – Failing to Assert that Mother Coached Victim

Finally, Vigil asserts that his lawyer should have argued that the mother coached the victim to make it all up and that the victim would have listened to the mother because she feared her. Pet. at 7 ("Mom . . . told her to say that I did it to her or she was going to die. Several of her family know about this . . . . Ineffective assistance of counsel."). The government responds, and the Court agrees, that defense counsel vigorously litigated this issue. CV ECF 7 at 11-13.

Defense counsel beat the government in two contentious rounds of evidentiary disputes to successfully admit the victim's hearsay statements indicating that the victim may have lied about the incident because she feared her mother. CR ECF 197 at 9-10; CR ECF 246 at 4, 55 (Court ruling admitting victim's hearsay statements as reflections of her state of mind, despite the government's authority "giv[ing the Court] pause").

9

Defense counsel used this evidence at trial by calling the victim's older-brother's girlfriend, who was close with the victim. CR ECF 246 at 57-58. Defense counsel elicited from this witness that the victim was likely abused, feared her mother, and wanted to live with this witness and the victim's older brother instead of her mother. *Id.* at 59-71. Defense counsel also pointed the witness to her prior statements in an investigation report to refresh her recollection that the victim had made two statements that called into question the veracity of the victim's statements to the doctor: first, the victim stated her "mom said she couldn't say anything [about what happened to her], and if she said something, that she would die[,]" and second, the victim told this witness that "her mom told her what to tell the doctor when they went." *Id.* at 60-61.

Defense counsel then effectively used this evidence in closing argument. CR ECF 247 at 28-29 (using this testimony to attack the mother's credibility as a mother "who stood by while her daughter was" abused, a mother "who told her daughter that she would die if she told anyone about this alleged incident[,]" and a mother who "told [her daughter] what to say when [they] went to the doctor.").

The record demonstrates that defense counsel was very effective in getting the victim's hearsay statements admitted, questioning the victim's brother's girlfriend about these statements, and then using them to attempt to create doubt about the victim's statements to the doctor and the mother's credibility. Defense counsel's representation well exceeded the requirements of the Sixth Amendment. Indeed, his counsel's advocacy doubtless contributed to the jury *acquitting* Vigil of Count 1 and finding him guilty only of Count 2. Additionally, the jury heard all this evidence and argument before finding Vigil guilty. As a result, there can be no prejudice because the evidence that Vigil asserts would have led to a different outcome was already used at trial. Vigil having failed to demonstrate either prong of the *Strickland* test, the Court finds and concludes that he is not entitled to habeas relief on this final ground.

## V. CONCLUSION

For the foregoing reasons, the Court recommends that the Motion be **DENIED** and this case **DISMISSED WITH PREJUDICE.** The Court further recommends, pursuant to Rule 11(a) of the Rules Governing Section 2255 cases, that a certificate of appealability be **DENIED**.

**SO RECOMMENDED**.

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension must be filed in writing no later than seven days from the date of this filing. **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**